SALTER, J.
Dominic Diodato, as personal representative of the estate of his late wife, Aviva *514 Diodato, appeals a final summary judgment in favor of the defendants/appellees, owners and participants in a recreational scuba diving operation known as “Key Dives” in Monroe County, Florida. Mrs. Diodato drowned on April 15, 2010, returning to a dive boat off Islamorada. This occurred at the very beginning of what was to have been an advanced open water dive to the wreck of the Eagle.
The final summary judgment in favor of the defendants was based on printed releases[1] signed by Mr. and Mrs. Diodato during a prior visit to the Keys in 2009 and again for a shallow reef dive the day before the tragedy. The trial court rejected Mr. Diodato’s argument and evidence that the dive operators had failed to follow their own standard practice of procuring a different form of release for the more advanced dive and the boat trip to be undertaken on the day of the tragedy.
Applying well-settled Florida law disfavoring and narrowly construing exculpatory clauses, we reverse and remand for further proceedings. The scope and duration of the “activity” to which the signed exculpatory provisions applied is a genuine issue of material fact that precludes summary judgment.

Facts

The trial court’s order recounts the primary elements of Mrs. Diodato’s tragic accidental drowning:
It was the practice of Key Dives to require their customers to sign a release immediately prior to a day’s dive. Each of the Diodatos signed a release in favor of Key Dives, and those connected with Key Dives, on August 29, 2009.[2] On the reverse side of the releases, they initialed boxes stating, “[t]his release is valid for one year from the date of this release.” On April 14, 2010, again before a dive, the Diodatos signed other releases; this time they did not initial the box providing for the one-year operative period. They dove that day. On the morning of the April 15, 2010, dive, the dive fatal to Aviva, the Diodatos were late in arriving, and did not sign a release. This final dive was to be a wreck dive to a ship called the Eagle. It was to be an advanced open water dive, a dive for which, according to the Plaintiff, dive industry standards dictated a particular form of release must be used.
On the morning of the dive, Aviva Diodato showed apprehension about diving. Though the reason for her apprehension will never be known, ocean swells were estimated to be between four and five feet. Dive instructor, now defendant, Leslie Peaker, and Dominic Diodato entered the water first. Aviva followed, but, after only submerging to a depth of approximately ten feet, she signaled to Peaker that she wanted to surface. She surfaced with Peaker accompanying her. He did not help her on board. Aviva reached for and held on to the boat’s granny line, but lost her hold and drifted away from the boat. The boat’s captain, and now defendant, Scott Alan Lorenc[e], sounded an alarm. After a brief search, she was found floating, but drowned.
There are additional facts in the record, including the specific language of the three forms of printed release (August 25, 2009; April 14, 2010; and the form Key Dives intended to obtain before the wreck dive on April 15, 2010), that affect the analysis. *515 The Diodatos were residents of Arizona and obtained their initial PADI certification [3] there. Their scuba training and four open water certification dives were in an Arizona lake in August 2009, a few days before their first reef dives in the Florida Keys.
The August 25, 2009, release was signed by Mrs. Diodato in connection with a series of six open water dives over a period of four days:
LIABILITY RELEASE & EXPRESS ASSUMPTION OF RISK
Please read carefully, fill in all blanks and initial each paragraph before signing.
I, (printed name) Aviva Diodato, HEREBY DECLARE THAT I AM A CERTIFIED SCUBA DIVER, TRAINED IN SAFE DIVING PRACTICES, AND AM AWARE OF THE INHERENT HAZARDS OF SKIN AND SCUBA DIVING.
[Initials ] I understand and agree that neither Islamorada Asset Mgmt., Inc. dba KEY DIVES; nor the dive supervision staff; nor International PADI, Inc., nor any of their respective employees, officers, agents or assigns (hereinafter referred to as “Released Parties”), may be held liable or responsible in any way for any injury, death or other damages to me or my family, heirs, or assigns that may occur as a result of my participation in this activity, or as a result of product liability or the negligence of any party, including the Released Parties, whether passive or active.
[Initials ] I understand that diving with compressed air involves certain inherent risks, including but not limited to, air expansion injuries, decompression sickness, embolism and drowning. Hyper-baric injuries can occur that require treatment in a recompression chamber. I further understand that this activity may be conducted at a site that is remote, either by time or distance or both, from such a recompression chamber. I still choose to proceed with such activity in spite of the possible absence of a recompression chamber in proximity to the dive site.
[Initials ] I declare that I am in good mental and physical fitness for diving, and that I am not under the influence of alcohol, nor am I under the influence of any drugs that are contra-indicatory to diving. If I am taking medication, I declare that I have seen a physician and have approval to dive while under the influence of the medication/drugs.
[Initials ] I understand that skin and scuba diving are physically strenuous activities and that I will be exerting myself during this activity and that if I am injured as a result of heart attack, panic, hyperventilation, etc., that I assume the risk of said injuries and that I will not hold the Released Parties responsible for the same.
[Initials ] I will inspect all of my equipment prior to the activity. I will not hold the Released Parties responsible for my failure to inspect my equipment prior to diving.
[Initials ] In consideration of being allowed to participate in this activity, I hereby personally assume all risks in connection with the dive(s) for any harm, injury or damage that may befall me while I am a participant, including all risks connected therewith, whether foreseen or unforeseen.
[Initials ] I further save and hold harmless said activity and Released Parties from any claim or lawsuit for personal *516 injury, property damage, or wrongful death, by me, my family, estate, heirs, or assigns, arising out of my participation in this activity, including both claims arising during the activity or after I complete the activity.
[Initials ] I further declare that I am of lawful age and legally competent to sign this liability release, or that I have acquired the written consent of my parent or guardian.
[Initials ] I understand that the terms herein are contractual and not a mere recital, that this instrument is a legally binding document, and that I have signed this document of my own free act.
I, (printed name) Aviva Diodato, BY THIS INSTRUMENT DO HEREBY EXEMPT AND RELEASE ISLAMO-RADA ASSET MGMT., INC. d/b/a KEY DIYES, AND THE DIVE SUPERVISION STAFF, AND INTERNATIONAL PADI, INC., AND ALL RELATED ENTITIES AS DEFINED ABOVE, FROM ALL LIABILITY OR RESPONSIBILITY WHATSOEVER FOR PERSONAL INJURY, PROPERTY DAMAGE OR WRONGFUL DEATH, HOWEVER CAUSED, INCLUDING BUT NOT LIMITED TO PRODUCT LIABILITY OR THE NEGLIGENCE OF THE RELEASED PARTIES, WHETHER PASSIVE OR ACTIVE.
I HAVE FULLY INFORMED MYSELF OF THE CONTENTS OF THIS LIABILITY RELEASE AND ASSUMPTION OF RISK BY READING IT BEFORE I SIGNED IT ON BEHALF OF MYSELF AND MY HEIRS.
(Aviva Diodato signature) 8/25/09
Signature of Participant Date
As already noted, Mrs. Diodato also initialed a provision on the reverse side of the form which stated: “This release is valid for one (1) year from the date of this release.” Although the record on this point is not explicit, it appears that the “activity,” referred to ten times in the body of the release, contemplated and paid for by the Diodatos in August 2009, was a series of six open water reef dives (maximum depths ranging from twenty to thirty-five feet) over four days, August 25-28, 2009. There is no summary judgment evidence indicating that, at the time the Dio-datos signed the 2009 form, they contemplated (much less made payment for) the 2010 advanced open water dive.
Following the August 2009 dives, Mrs. Diodato’s dive manual next recorded three more lake dives in Arizona. On April 14, 2010, the Diodatos returned to Key Dives and Islamorada for additional dives. The April 14, 2010 release signed by Mrs. Dio-dato was the same printed form as she had signed on August 25, 2009, but this time she did not sign or initial the “valid for one year” provision on the back of the form. According to the instructor, the dive in question was a recreational “shallow reef’ dive to prepare them to participate in an advanced open water, much deeper dive the following day.
For the April 15, 2010, wreck dive, Key Dives procedures required a different form of release. The caption of the form included “boat travel,” and the scope of the release referred to an “Excursion” (consisting of “scuba diving including those hazards occurring during boat travel to and from the dive site”) rather than an “activity.” The April 15 form included specific reference to additional hazards that were not a part of the August 25, 2009, or April 14, 2010, releases: “slipping or falling while on board, being cut or struck by a boat while in the water; injuries occurring while getting on or off a boat, and other perils of the sea; all of which can result in serious injury or *517 death.” The form also included spaces to indicate whether the passenger/diver had diver accident insurance and, if so, the policy number.
The parties are on common ground that the Diodatos’ instructor for the April 15 advanced open water dive intended to have the Diodatos sign the “Excursion” form of release, but did not do so because they were twenty minutes late arriving at the dock. The instructor testified that two other participants in the dive were waiting on the boat, and “It takes about half an hour to go through the knowledge review, plus the paperwork.” He intended to have the Diodatos sign the papers “when we got back.” And in contrast to the “recreational” reef dive the preceding day, the April 15 wreck dive was characterized by the instructor as a “deep dive.” The instructor testified at his deposition that “There is no reference, except for the [descent] line. Sometimes people get a little bit unnerved by that, and that is what I felt happened to [Mrs. Diodato].”
The trial court granted the defendants’ motion for final summary judgment based on the language of the August 25, 2009, release (including the “valid for one year” provision on the back of the form) and the April 14, 2010, release. These appeals[4] followed.

Analysis

Under Florida Rule of Civil Procedure 1.510(c) and Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000), the appellees were entitled to summary judgment only if the pleadings, affidavits, depositions, discovery responses, and other evidence in the record establish that there is no genuine issue of material fact, such that the appellees were entitled to such a judgment as a matter of law. Our review is de novo.
We review the exculpatory provisions in the August 25, 2009, and April 14, 2010, releases under the well-settled principle that such clauses are disfavored and are narrowly construed:
Exculpatory clauses are disfavored and are enforceable only where and to the extent that the intention to be relieved from liability was made clear and unequivocal and the wording must be so clear and understandable that an ordinary and knowledgeable person will know what he is contracting away. Gayon v. Bally’s Total Fitness Corp., 802 So.2d 420 (Fla. 3d DCA 2001); Raveson v. Walt Disney World Co., 793 So.2d 1171 (Fla. 5th DCA 2001).
Cain v. Banka, 932 So.2d 575, 578 (Fla. 5th DCA 2006).
In the case at hand, another aspect of contract interpretation comes into play as well. A release containing exculpatory language is part of a commercial transaction having a discernible scope and term. “Scope” would reasonably address the hazardous activity which the releasor has paid the releasee to allow him or her to undertake, and which the releasee insists must be at the releasor’s own risk if the activity is to proceed. “Term” would reasonably address the anticipated duration of the hazardous activity for which the release has been required and obtained. The scope and term of one hazardous activity may naturally vary significantly in the level of risk assumed by the releasor when compared to another hazardous activity.
A pre-printed release signed for an introductory scuba certification class in shallow water would ordinarily have a different *518 scope, level of risk, and cost than a deep water cave dive or offshore wreck dive, for example. The pre-activity “knowledge review” described in the instructor’s testimony in this case was plainly calculated to communicate the risk of an advanced activity to the participant about to be asked to initial and sign a form of release. The textual question is whether a particular exculpation clause extends to any and all scuba dives, irrespective of risk and skill level, or whether that clause is limited to the instruction and activity for which payment has been made and risks disclosed.
Examining the two releases signed by Mrs. Diodato in this case (and reprinted in full above), it is apparent that each refers to an “activity” ten times:
... any injury, death, or other damages to me.. .that may occur as a result of my participation in this activity, or as a result of product liability or the negligence of any party...
I further understand that this activity may be conducted at a site that is remote... I still choose to proceed with such activity in spite of the possible absence of a recompression chamber in proximity to the dive site.
I understand that skin and scuba diving are physically strenuous activities and that I will be exerting myself during this activity...
I will inspect all of my equipment prior to the activity...
In consideration of my being allowed to participate in this activity, I hereby personally assume all risks in connection with the dive(s) for any harm, injury or damage that may befall me while I am a participant....
I further save and hold harmless said activity and Released Parties from any claim or lawsuit ... arising out of my participation in this activity, including both claims arising during the activity or after I complete the activity.
“Activity” is not defined in the releases signed by Mrs. Diodato, but the record does demonstrate that the August 25, 2009, release was signed in connection with six open water reef dives over the course of four days.[5] Similarly, the April 14, 2010, release involved a “shallow reef’ or “regular” dive led by an instructor to prepare for the following day’s deep water wreck dive.
The April 15 dive was to be a qualifying dive for the higher-level “advanced open water” PADI certification. Thus the “activity” that is the subject of the April 14 release is different from the definition of “Excursion” in the form of release that Key Dives procedure specified was to be executed by the Diodatos before the April 15 boat trip and offshore “deep dive.” The “Excursion” form also would have permitted the parties to state in writing whether “diver accident insurance” had been purchased.
Recognizing these differences in the signed and unsigned forms of release at issue here, we turn next to the case law relied upon by the parties. At the outset, we are unpersuaded by the “abandonment by conduct” case law advanced by Mr. *519 Diodato. Cases such as Painter v. Painter, 823 So.2d 268 (Fla. 2d DCA 2002), and Klosters Rederi A/S v. Arison Shipping Co., 280 So.2d 678 (Fla.1973), hold that a party may waive or abandon contract rights by taking action inconsistent with those rights,[6] but in the case at hand there is no indication that Key Dives waived or abandoned the signed releases to the extent of the “activity” encompassed by each. Had the April 15, 2010, dive been a continuation of the basic open water instruction contracted for by the Diodatos in 2009 (and thus a part of the “activity” knowingly contracted for by the parties at that time), the scope and term (because of the one-year clause) of the 2009 release would apply. Had the April 15, 2010, advanced open water dive involved the same “activity” and level of risk inherent in the “regular” and “shallow reef’ dive of April 14, 2010, the scope and term of that release would apply.
Instead, the defendants’ April 15 form recognized a different activity and level of risk, expressly defining this activity as an “Excursion” and including within it the hazards of scuba diving as well as “injuries occurring while getting on or off a boat, and other perils of the sea,”[7] a category of harm not addressed in the signed releases. And because the defendants’ prescribed form was not presented or signed, we will never know whether Mrs. Diodato might have inquired about diver accident insurance, or obtained it, as contemplated by the separate PADI form.
We conclude that the analysis in this case turns on: the ambiguity in the term “activity” as used (in the singular) to cabin the scope of the signed releases; the appellees’ concession that a more extensive definition was necessary for the April 15 boat trip and dive; and the settled Florida law that such pre-claim exculpatory clauses “are disfavored and thus enforceable only to the extent that the intention to be relieved from liability is made clear and unequivocal.” Hackett v. Grand Seas Resort Owner’s Ass’n, Inc., 93 So.3d 378, 380 (Fla. 5th DCA 2012) (reversing summary judgment because the “level of ambiguity” in an exculpatory clause was simply “too great to permit enforcement”).
The trial court’s order granting final summary judgment cited Paralift, Inc. v. Superior Court, 23 Cal.App.4th 748, 29 Cal.Rptr.2d 177 (1993). In that case, the decedent had signed a skydiving release approximately three years before a tragic accident in which he fell to his death in the Pacific Ocean. The decedent’s estate and daughter argued that the release made no reference to jumps involving heightened risk “over large bodies of water or in particular weather conditions.” The California Court of Appeal found the release to be enforceable. The exculpatory provisions in that case, however, involved “parachuting activities” (plural in each reference) without limitation, and the record demonstrated that the decedent was “a *520 highly qualified and licensed skydiver who had made over 900 skydives prior to the fatal jump which gave rise to this action.” The record also showed he had jumped over the same area (near the coastline) a year before the fatal jump. There was no testimony or documentary evidence to suggest that the releasee in Paralifi required different forms for different types of jumps involving different levels of certification and risk.
Finally, it is apparent that the signed 2009 and 2010 releases in the present case could be slightly modified to be “clear and unequivocal,” using words “so clear and understandable that an ordinary and knowledgeable person will know what he is contracting away,” Cain, 932 So.2d at 578, by expanding the scope from the “activity” at the time the release is executed to include, for example, any and all future courses of instruction, programs, scuba dives, certification levels, and dive-related boat travel, undertaken by the releasor.

Conclusion

Floridians and visitors to our State are generally free to engage in hazardous recreations such as jet-skiing, para-sailing, skydiving, scuba diving, rodeo competitions, and auto races (to name a few), and to assume contractually all risks associated with those recreations before engaging in them. It remains the case, however, that we disfavor and narrowly construe such pre-claim exculpatory terms. Applying that rule of construction to the record in this case, and under the rigorous standards applicable to our de novo review of a summary judgment, we are constrained to reverse the final summary judgment and the judgment for costs.
Reversed and remanded for further proceedings.

. Though captioned and referred to as "releases,” the provisions at issue here are actually pre-claim exculpatory clauses.

. The actual date on these releases was August 25, 2009.

. PADI is the acronym for the Professional Association of Dive Instructors.

. Mr. Diodato appealed the order granting the defendants’ motion for final summary judgment, Case No. 3D 12-2276, and later the final judgment itself, which included a provision taxing costs, Case No. 3D12-3393. The appeals were consolidated for all purposes.

. This explains the logic or necessity for checking the "valid for one year” clause on the back of the form. That provision eliminated the necessity for signing a separate form for each of the six open water dives. It does not necessarily follow that it applied to any then-uncontracted-for, higher-risk, separately-purchased deep water dives ten months later. By inference (and inferences must be indulged in favor of the non-movant), this is why Key Dives required a new release on April 14, 2010, on the return visit within the one-year period, instead of relying on the "valid for one year” provision in the August 2009 release.

. In those cases, the party entitled to enforce a contractual provision unequivocally revoked or waived its right to enforce the provision. In the present case, the appellees never suggested by word or deed that the signed releases had expired or been superseded. The question is whether those releases applied to every aspect of the Diodatos’ different "activity” on April 15th.

. We must respectfully disagree with the conclusion in the order granting summary judgment that the form intended by the defendants to be obtained (but not obtained) for the April 15, 2010, boat travel and dive involves only "a distinction without a substantial difference" when compared to the earlier, signed releases. It is certainly a factual issue, and for a jury to consider, whether Mrs. Dio-dato's drowning actually occurred as a result of scuba diving alone, or from “getting on or off a boat, and other perils of the sea” (in this case, significantly-higher waves and current).